I can't say good morning, your honors, anymore. Good afternoon. You wish you could. Yes. My name is Jack Tucholsky. I'm the attorney for Northern Plains Resource Council. I apologize for coming up here before my time, prior case. I would like to reserve five minutes of my time for rebuttal, and I understand that I'll have to get off the podium to keep that talking. I will try to do that. There are two issues that the court must address here. The first is whether coal bed methane or CBM discharge water is a pollutant under the Clean Water Act. The second issue is whether Montana can essentially enact an exemption to the federal NPDES permitting requirements. I'm going to address the pollutant issue first. Coal bed methane discharge water is a pollutant because it is industrial waste and because it contains substances that EPA has formally classified as pollutants. It is industrial waste because it comes from an industrial process. Wells are drilled into the ground. Gas and water are piped to the surface. There are compressor stations, pipelines, electrical transmission lines, roads, and associated facilities. The end product is commercial methane gas. The waste product is water, and all the water in this case is waste. It is dumped into the Tongue River and into Squirrel Creek. It matters not whether a hypothetical cow can drink this water under some circumstances. The water at issue in this case is 100 percent waste. Now, what if the water were not, as this water is, filled with substances that, for example, the farmers don't want and therefore they don't want to use or have to use it as irrigation water, but what happens if the water that was a byproduct of some industrial process were pure, even purer than the body of water into which it were dumped? Would it nonetheless be industrial waste? Your Honor, that's a tougher question because under the definition, if you use the plain language, industry and waste, yes, it would be industrial waste. I think the Court's reading in the Hammersley case says that you have to inject a notion of common sense and read the statute in the context of the overall purpose of the Clean Water Act, which is to prevent pollution. Would your answer be it's not waste because it's pure or it is waste and therefore you have to get a permit, but don't worry, the permit will be easily available? I mean, how do we deal with it? I would argue the latter. It is clearly waste if it is, I mean, the common sense definition of waste. In this case, they use the gas. The water is of no use to anyone, so at that point it becomes waste. It seems we have to read the act to preserve its integrity to use that type of phrase from the Affetti case if there's some ambiguity, but if it's not ambiguous and Judge Fletcher's hypothetical, it is industrial waste even though it's pure, then it would seem like Congress has said you have to have a permit for it. And I would agree with that. I would say that, you know, again, we're not saying you can't discharge this stuff. You just have to bring it under the permitting process and the permit in that situation would be very liberal because And I guess maybe it would be disputed in a real world case whether it is pure and EPA looks at it, says it is pure, here's your permit. That would be probably your answer. That's correct. And in this particular case, because this water is not pure and because it has so many constituents that are considered pollutants by EPA, that I don't think you have to go there. Could you shed a little light in terms of what the record shows, if it does show this, about the nature of this process? It's not like one big well is dug. It's a whole bunch of smaller wells. That's right. What is the nature of the actual process shown by the record of getting this gas out of the coal bed and how the water comes up? They drill a conventional well into the coal seam and then they route out the bottom of the well. This is in the testimony of Bruce Williams, who is the vice president, and it's in some other places as well. And they pump the water to the surface and through the process, the methane gas separates from the water. The methane gas is then piped and there's lots of wells in a field. There's up to 250 producing wells. They collect the methane gas in compressor stations powered by diesel generators. They ship the gas to market. The water is then collected in pipes or in reservoirs and it is discharged into surface waters. One thing I was trying to understand that I didn't understand was whether the water is, and I'm not sure it's necessary under the statute, but whether it's transformed by the human activity at all. Because, you know, in one sense, I sort of thought when I first read it that maybe the water and the gas are mixed together somewhere under the ground there. And then they separate the gas out of it or it separates. But then I then I read other things where the judge is saying it's unaltered water. The water is is unaltered in the sense that they don't put chemicals in it during the drill. But is it the same? It's altered. If the gas was integrated within the water, I guess it's altered in the sense that the gas is out of the water. Absolutely. As a result of bringing it up through their process, the methane goes one place and the water goes somewhere else. If you went down to where the well is, if the record shows us where the where the well, the drill, the whole pipe goes down into some pocket where there's groundwater in that area. Is there like separate water and gas or is there some separate and some merged together? Do we know? Your Honor, I don't know that the gas is actually trapped in the coal seam and the water is also in the coal seam as well. But I guess the point I wanted to respond to that, the transformative human process here is bringing it all to the surface. Right. This water would never get into the Ton River, moving it to the surface. Just like if you pump water from the Pacific Ocean into the Columbia River, it's being transformed by by moving it. That's right. And as my argument would be, if you started pumping the Great Salt Lake into a trout stream, even though the Great Salt Lake is natural water, you would be transforming the trout stream, the chemical composition of that water. And that's the focus of the Clean Water Act. Really, it's on the receiving water. That's the water. I'd have to go back and look at what we said in the FETI. But I thought when we were talking about something being transformed by human process, that it related to biological matter, which was listed as one of the items that could be a pollutant, that we weren't saying that every every single thing in there had to be transformed. That's correct. In fact, it's on your decision on page 10, 16 and 10, 17, where you make that point that and I think this is a quote, the court doesn't mean to suggest that naturally occurring materials can't be pollutants. Because the statute lists like sand and gravel, for example. Exactly. And sand and gravel are naturally occurring pollutants. And so that's and that's where we think the district court erred in focusing on not what is in the water, but on the fact that people didn't put chemicals into this coal bed methane water. And the real test should be, you know, what constituents are going into the receiving water that caused the pollution. That's the problem here. The definition of pollution helps the. I guess helps the case of appellate the pollution as opposed to pollutant debt. The act has a definition of pollutant. It's also got one of pollution. Right. That's correct. And the pollution definition focuses on the receiving waters being altered by the substance. Right. And that's what the Fifth Circuit held in Cedar Point, the 11th Circuit held in Micoseki, the Second Circuit held in the Catskills case is that when you the transformative activity makes it pollution in the receiving waters. And that's what the act is designed to prevent. Does the record show anything about whether a Pele sought a permit and what the results of that were? They have a permit. And that's what's so ironic about this case. They sought a permit for both the Tongue River and Squirrel Creek. They were issued a permit eventually for Tongue River. And we claim that they didn't have enough. The permit only provided for seven outfalls, but they were discharging from 12 pipes in the river. They were not granted a permit for Squirrel Creek. They applied for one because the department said that even though we have this state law exemption, we are not going to give you a permit because you're going to alter the water quality of this little stream called Squirrel Creek. And so they denied a permit for them. And that's another distinguishing point from the Affeti case. There the state agency said, hey, you guys don't need a permit because this is not pollution. I would like to address the state exemption issue if I could, because I think that that is controlled by this court's holding in American Mining Congress versus EPA, which draws from NRDC versus Costill. And in NRDC versus Costill, the D.C. Circuit, and this is well-settled law at this point, the D.C. Circuit said EPA cannot create exemptions for the definition of pollutant. Only Congress can do that. And that holding was reaffirmed in the American Mining Congress case. Montana can do whatever it wants for state law, and that's not the issue here. But when it comes to exempting pollutants from the Federal Clean Water Act, which is what the district judge interpreted Montana's law as being able to do, if EPA can't create an exemption, then Montana surely cannot create an exemption, because, you know, it's an EPA-delegated program. And so the fact that Montana has passed a state law is fine, but that state law cannot serve as an exemption to the Federal Clean Water Act. And the district court erred when he basically held that that was an exemption. What's the legal handle that supports those American Mining Congress – is that supremacy clause or is it something else? No, it was straight off the – NRDC versus Costill was straight off the statutory language of the definition of pollutant and that the EPA was not given authority under the plain terms of the statute to exempt classes of pollutants. There's two exemptions in the definition of pollutants, one of them being for produced water from oil and gas development that is injected into a state-approved well. That is an exemption, and so the court looked to the act and said, look, there's a couple of exemptions here, those are fine, but EPA just does not have the regulatory authority to create new exemptions. And drawing on some of the facts in this case that I think are very important is that this water really does have pollutants in it. It has 300 times – 300 percent greater salinity or total dissolved solids. It has eight times as much fluoride as the receiving water. It has ammonia, arsenic, barium, copper, iron, and lead. And EPA, in its regulations, has stated that these substances are all pollutants. And the district court just said, well, EPA, you have no authority to declare these pollutants, but in fact, in Section 1361 of the Clean Water Act, EPA does have general authority, and under 33 U.S.C. 1317a, EPA is given authority to designate toxic pollutants, and they did that. And on that list – This is an alternative argument to saying it's an industrial waste? Right. It's like an alternative theory of why we should view the water as being a pollutant. That's correct. Because it includes specific, more specific things that the EPA has defined by regulation as – As pollutants. Right. And if you find it industrial waste, then, you know, the argument's over. But if the Court has any ambiguity about whether or not it's industrial waste, then if you go to EPA's own regulations, which you have to give deference to under Chevron, it lists these substances as pollutants. And for toxic pollutants, it lists arsenic and copper. And it's undisputed, based upon – this is Fidelity's own data. It is undisputed that copper and arsenic are contained in this discharge water. But then you would say we don't have to reach that second issue if we find this is industrial waste. That's correct, because it would come under the plain language of the definition. And if the Court doesn't have any additional questions of me at this time, then I will sit down and reserve the rest of my time. Thank you, Chief. And please, the Court. Ron Waterman on behalf of Fidelity. Your Honor, I'd like to first start by just addressing one of the issues that you raised in the questions that you asked counsel. Just so that we have an understanding as to how cobalt methane is brought to the surface, what we have is not an intermix of the gas, but what happens is the pressure of the water holds the gas into the coal seam. When the water is withdrawn, then that pressure is relieved and the gas comes to the surface. It is not an intermix. Basically, the water, as you understand it in the record, is coming out the way it is under the ground. That's correct. The water, if you will, forms a cap or a plug that keeps the gas in the ground. When the water is withdrawn, then that reduces the pressure and the gas comes out. I kind of assume that. Go ahead. I was just going to say, for me, the heart of the case and the difficulty with the position here of a Pele is the definition of pollutant, including industrial waste. And it's seeming, at least at first blush, that what we're dealing with here is an industrial waste. It's an industrial process to extract gas. There is a statutory exemption that's not applicable. And like if you do it, you know, a certain kind of level of operation. But but here that's not involved. And so how can you say this is not an industrial waste? Personally, let me answer the back half of that question first, because it's important to note this is not produced water in the Cedar case that this court concluded. Look at what was produced water, which is a defined term of art. And it includes essentially grease and oils and the like. Well, there when they pump it out, something got into the water. Well, it both brings it both brings up and it also adds things to it. And in industrial waste, what we have here is on the face of the definition of the word pollutant. What we find is first the Congress gave us a definition and did not define industrial waste at all. And the EPA, when it adopted a definition of pollutant, essentially adopted wholesale, except for a few minor additions, the words that the Congress had passed. So the definition of pollution in the Clean Water Act and in the regulations are the same. Where do we go with respect to industrial waste? We submit and we argue and we argued to the district court and would argue here, that since that phrase is not defined by the Clean Water Act, that what you can do is you can look to other instances of statutes passed by this at the same time by the same Congress. And that takes you to the Marine Petroleum Research and Sanctuaries Act, 33 U.S.C. 1401. And that act defines industrial waste and that definition is any solid, semi-solid or liquid waste generated by a manufacturing or processing plant. And to some degree, I believe that the Affetti case likewise speaks to that same issue as to what exactly a pollutant means under the Clean Water Act. And this Court said in Affetti that that must mean some type of a substance that is transformed by human activity. The problem that I see with counsel's arguments is that applied, if you will, everything becomes an industrial waste if there is any activity, human activity, that is connected with the discharge. Well, any industrial human activity. Any industrial human activity. And I would submit, Your Honors, that under either of the theories that Northern Plains has advanced here, if what you had was the Congress wanting to say that any discharges into the navigable waters of the United States was required a permit, the Congress could have said that. But it chose specifically not to say that. It used different language. It used pollutant and then provided a list of incorporating terms dealing with pollutants. OK, let me ask a question to see how you're hypothetical, to see how your theory would run out on would work on. Let's say somebody wanted to pump seawater to someplace in the state of Washington and extract gold from it. And and then pump the seawater minus the gold into the Columbia River. Can they do that under the Clean Water Act without a permit? Right. Your Honor, I would I would submit I would have to know more about the underlying details to be able to honestly tell you whether or not they could do that. I would say it's a decent they want to take salt out of water and salinate the water and and pitch the salt and keep the pure water. Can they do that without a permit? If the if the water in which they're discharging does not otherwise contain pollutants, I believe they can. Now, if if if you're well, your Honor, let me ask company doesn't think it needs a permit. Why did it apply for permits and get permits? Your Honor, maybe that's irrelevant to the statutory issue, but I'm sort of interested in it. Let me go back to that because it was one of the other points I did want to respond because there was an issue that was raised in the colloquy with counsel. Judge Gould, what we had here was my clients went to the state, which is the administrative agency. It is the designated agency by the EPA to issue the NPDES permits. So they went to the right agency and they said, tell us, do we need a permit? And that state agency in the record shows repeatedly told my clients that they did not need a permit. My client concluded, nevertheless, in what I would otherwise call an abundance of caution, maybe it's a lawyer caution, to apply for the permit in any event. And that permit issued and these waters that counsel tells you is replete with pollutions is now a permitted discharge. So we're not dealing with something that on examination anyone said required a treatment other than just simply the permit. And what we have here is a lawsuit dealing with, because this is a public citizen clean water lawsuit, looking at the discharges in the Tongue River from five outputs for a period from June 22nd, 2000, to July 6th, 2000, because it was during that period of time only when the Department of Environmental Quality issued its first permit, omitting the number of outfalls that we listed. And that's not the only issue. If this doesn't require a permit, well, then Katie bar the door. Meaning if it requires a permit, that requires continuing supervision as to the number, the quality, and so on. Well, Your Honor. So it's not just those five little discharges. Well, that's – but even if it doesn't require a permit, there are still the State and other regulations that will apply so that it's not Katie bar the door. The envision that somehow or other there is no regulation under the state law, under the state water quality law or the like, or under the federal law relative to these discharges is false. Let me ask you this, and this is just mechanically as to the process. Is there pumping necessary to bring this water to the surface, or does it come to the surface naturally once the hole is drilled? No, there is pumping, Your Honor. It has to be pumped. So we've got – I'm not sure that it wouldn't be sort of an industrial process if all you did was drill, but you drill and pump. We drill and pump. Some genuine activity that moves the water from one place to the next. That's correct. I do want to go back, however, because I think that we have this fallback argument, and I want to address that fallback argument for just a moment, because I think it demonstrates the vice of where we see northern plains coming here. They tell you that if – that these substances are regulated, they are listed by the EPA as being pollutants, and therefore that is sufficient to justify the requirement of a permit in this instance. But let me just simply walk you through what the chemistry is, because you have to understand, if you will, and what the record shows. The chemistry of this water, the various items that are listed as pollutants, is also the chemistry of the Tongue River. All of those items, calcium, magnesium, et cetera, et cetera, all of those are also in the Tongue River. There's a reason for that. Actually, there's two. One, upstream from where our discharges are, other coal bed and other activities make discharges into the Tongue River, and number two, coal seams intersect the Tongue River, and so as a consequence, as a natural process, all of those items are there. If what counsel has said is correct, that is, that because the EPA has listed these substances as pollutants, and therefore they are required for a permit, then this is the circumstance you have. If you diverted the Tongue River, held it in a place, and discharged it, you would require a permit. If you discharged it somewhere else. No. Into a different body of water. Not at all. No. You wouldn't even have to do that, Your Honor. I believe that under their argument as they make it, even if you discharge it back to the Tongue River. But I think there's case law that tells us that if the water is temporarily diverted and returns to the same body of water, that that's not a discharge. Your Honor, that may be a separate issue with respect. Isn't that right, that there is such case law? There is some case law to the effect, to that effect. But I would submit that under these circumstances, what they're arguing is that they would say that that's a pollutant, that is the introduction of a pollutant, and therefore. I would like to hear him make that argument. And therefore requiring a permit. What we have here is the issue of what the Court found. This is unaltered groundwater. Not affected in any way. And if you look at all of the cases, and we believe we have. And this is, I must admit, I think this is as close to a case of first impression as you can find. Because there are not a lot of cases that look at the question of pollution and try and make a decision as to whether or not an unaltered substance, and the importance there is unaltered. An unaltered substance, therefore, requires a permit before it's discharged. And in each of the cases that counsel has cited, in each of the cases that the parties have looked at, I believe that in all of those cases, either number one, the concept of pollution was conceded by the parties, so it wasn't in dispute. Or number two, what you found was that there was some additive process. As this Court said in Anafetti and the like. That it is that type of activity that we are talking about. But the mere fact that it might be unaltered doesn't seem to me fully sufficient for your purposes. That is to say, you could imagine that a particular chemical is used as a catalyst. The chemical occurs in nature. It goes through the industrial process as a catalyst. Because it's merely a catalyst, it comes out unaltered, and then you dump it in the river. Now, under your argument, I think it's not then industrial waste that requires a permit because it's unaltered. Isn't that right? To some degree, Your Honor, that would have to be unaltered. I'm not sure that's right. But the converse is that if there is any industrial activity, if you will, what we've done under Northern Plains' argument is we've removed the concept of a pollution or a pollutant as requiring a permit. And what we've moved to is saying any industrial discharge requires a permit. And I will concede that the Congress could write the law in that fashion. But I will tell you, and Mr. Tchaikovsky cited to you what the courts have said about that, that is the function of Congress. It is not the function of the EPA to develop then other definitions that broaden that definition. And that's where we're at. We are at a crossroad. But then I would agree with you that the EPA may not have power to broaden the definition of what's a pollutant or to exempt things that are pollutants. So at least for me, the main question is, is it an industrial waste? And once again, Your Honor, I go back to the only thing that I can look to, because there is not a whole lot of definition of industrial waste. You're looking at another contemporaneous statute that defines industrial waste a certain way that would exclude this. And what do you think, if we looked at the purposes of the Clean Water Act, where would that lead us? Your Honor, I once again, I don't believe that it leads us to the result that says that the district court was incorrect. I think that what we get is in this set of facts, and it is this set of facts that this is not a pollutant that was intended to be regulated by the Clean Water Act. And that is what, you know, this is a factually driven record. I will admit that there are hypotheticals that the Court has posed and that I can pose, and undoubtedly that counsel will pose, that would suggest that a different conclusion should be reached. In this instance, on this set of facts, we believe and we submit the district court's ruling was correct. I do want to just address just very briefly what the Montana statute did and what the Montana court did, because it's important to understand that the Montana statute, in determining when a permit was not required, is not just simply saying unaltered groundwater. It is unaltered groundwater that does not contain industrial waste, that does not contain and does not otherwise exceed the standards that are applicable before that applies. So even that exception is narrow, and it is part of the reason why, when we looked at Squirrel Creek and the discharges into Squirrel Creek, why the DEQ said we will not apply this exception to those discharges. There has been this continued debate as to the effect of the Montana statute and the application that that has and whether or not the EPA has accepted that. We believe that if you look at all of the correspondence between the parties, what you see is ultimately the EPA coming back to Montana, which is a delegated authority, saying we can accept that definition and we will allow you to apply that definition. And we believe that under those circumstances, what the EPA is then saying is that we likewise, like you, do not find this alone unaltered groundwater as being a discharge, which is a pollutant. We are very narrow here, and there are issues which we believe we could talk about and I won't get to. I want to just simply brush on them. There is this question, as we pointed out, and as counsel has conceded, we did apply for a permit. A permit issued. The question is, there is an underlying good faith question relative to whether or not this action or this litigation should have been brought at all. By the time the litigation was filed, the permits had issued. By the time the litigation had been filed, we had at least indicated that we were in the process and had terminated our discharges into Squirrel Creek. The only discharge that counsel for Northern Plains looks to is a discharge into Squirrel Creek that continued for a period of time, which they knew about on the day before they filed suit and which they did not disclose until a year later. Kennedy. Judge Fletcher notes if we hold no permit is required, then there would be no need to renew those permits. There might be other State or Federal laws that acted as constraints, but those permits wouldn't have to be applied for. That's correct. They would not have to be applied for. And, Your Honor, it is important, however, to go back to the latter corollary of the Court's question, and that is there are, in fact, other State and Federal laws that apply here. There are non-DEG regulations and rules that apply here. The question here is whether or not this is a pollutant within the Clean Water Act. And we submit that the Court below made the proper determination saying that it was not and setting forth the reason. And I submit that the industrial waste argument will essentially broaden the definition so that it is all industrial activity that results in a discharge. And what that means is that this Court is then rewriting what the Clean Water Act says, because the Clean Water Act and the Congress was clear. They intended to require a permit only where there was a discharge of a pollutant, not when industry simply made a discharge. And I submit that the record is clear on that point, because had they wanted to speak with the broader language and with the broader sweep and with what Northern Plains is suggesting you should rule, they could have done so. And we believe if the Congress had intended to do it, it should have, and that neither the EPA nor, with all due respect, should this Court then redefine that language to add that sweep. Unless there are other questions. Thank you. If I could just address a few points here. The facts in this case, other than this issue were stipulated to, there were discharges occurring after the suit was filed. This water is not benign. The facts show that their own experts said you cannot apply this water on a field without risking damage. The ramifications of this case are enormous. In the record, it shows that there is an environmental impact statement that the record decision is going to be signed March 28th of this year that will authorize up to 20,000 new wells in the state of Montana. If this Court holds that this is not a pollutant, those discharges will not be subject to regulation under the Federal Clean Water Act. The state laws that Mr. Waterman refers to are state laws that are all premised on this stuff being considered a pollutant. If it's not a pollutant, it is not going to be subject to regulation. I would refer the Court to the Cedar Point case, because the Cedar Point case from the Fifth Circuit made an apt analysis as to why this is industrial waste, and it said it's industrial waste, and then if you add chemicals from the drilling process, then it becomes chemical waste. And it quotes the definition of produced water. And despite what Mr. Waterman said, the definition of produced water contained in the regulations at 40 CFR 435.41 state that produced water, which is water that results from oil and gas development, which is what this is, is brine, is salt water, which is what we have here, that can include chemicals, but it doesn't have to. And so the EPA has extensive regulations that apply to this very water, which the Cedar Point, the Fifth Circuit Court applied only as a corollary to first finding that we have industrial waste here, and I don't think the Court needs to go any farther than that. This argument about it's essentially an in para materia argument that because there's this other definition in the Marine Mammal Protection Act of industrial waste that should apply to the Clean Water Act, they have it backwards. As the Supreme Court said in the Erlenbaugh case, and this is cited in my brief, you only want to, if you have one statute that's very narrow and then another statute that's broad, and the Marine Mammal Protection Act is narrow and the Clean Water Act is broad, then you don't take the definition from the narrow act and apply it to the broad act. So to apply this definition of industrial waste from the Marine Mammal Protection Act is opposite of how the Supreme Court said you should try to harmonize these statutes. The definition of pollutant is very broad, and that's how courts have interpreted the Federal Clean Water Act because they want it to fit with the overall purpose. We're talking about a law that Congress said we're going to end pollution by 1985, and to interpret this law as to not regulating this discharge would not fulfill the purposes of the act. Judge Fletcher, you were right. There are dam cases that, you know, if you just stop the water and put it back in the same water body, those are not pollutants. Even if the fish have been pureed. That's right. There's a line of cases there, and I don't think they're relevant here. I guess the final point I'd like to make here, and I know it's been a long morning, is that it's not often that irrigators and an environmental group and an Indian tribe will come before this Court and speak in one voice, and they are here to speak in one voice because they don't want this water in their rivers unaltered. It has the potential to cause profound damage to crops, to fish, to aquatic ecosystems, and we want to bring it under the regulation of the Federal Clean Water Act. It doesn't mean that we're going to shut down the industry. It just means that they have to go through the permit process. Thank you very much. Thank you, counsel. Thank you both very much. The case just argued will be submitted. The Court will stand on recess for the day. All rise. This Court for this session stands adjourned. Thank you.
judges: Reinhardt, W Fletcher, Gould